UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIK HANSEN-DREIJER, MARTHA HARRIS HANSEN-DREIJER and HANSEN-DREIJER MARINE ENTERPRISE, INC.<br><br>                    Plaintiffs,<br>    v.<br><br>WORLD BUSINESS LENDERS, LLC, WBO SPL I, LLC,<br><br>                    Defendants. | CIVIL ACTION NO._____<br><br>**COMPLAINT** |

      Plaintiffs, Erik Hansen-Dreijer, Martha Harris Hansen-Dreijer and Hansen-Dreijer Marine Enterprise, Inc., hereby bring this action against Defendants, World Business Lenders, LLC, and WBO SPL I, LLC, and by way of complaint, allege as follows:

## INTRODUCTION

      1.     This is an action to prevent a New Jersey company—World Business Lenders, LLC—from circumventing the state's usury laws in order to destroy small businesses.

      2.     Plaintiffs, Erik Hansen-Dreijer and Martha Harris Hansen-Dreijer, approached broker Justin White of Go Empower Group, needing money for their towing and tugboat services business, Hansen-Dreijer Marine Enterprise, Inc. Plaintiffs were presented with a short term, high interest transaction by World Business Lenders. Though presented as business loans for Hansen-Dreijer Marine Enterprise Inc., the loan transactions eventually turned out to require backing by a mortgage on Erik and Martha's home and nearby property, among other unconscionable

requirements. Erik and Martha now risk losing their family home due to the usurious terms of the World Business Lenders loan.

3. This case is representative of a dangerous trend currently spreading in the marketing of financial products: placing unsophisticated small business owners' homes (and/or properties) at risk by issuing a financial product doomed to fail.

4. Since the subprime mortgage crisis fifteen years ago, courts have been dealing with the fallout of mortgages on homes backing loans that were inadequately underwritten and doomed to fail. Although regulations have been adopted to protect residential mortgagors, lenders have found a way to technically circumvent the protection provided by the regulations by designating the loans as "business loan agreements." Nevertheless, framing the loan as a "business loan" cannot exempt lenders from applicable usury regulations.

5. On January 5, 2021, the Attorney General of New York, joined by the Attorney General of New Jersey, filed a complaint in the Southern District of New York in a continuous effort to protect small businesses and their owners, much like Plaintiffs, from predatory lenders like WBL. In this case captioned *People of The State of New York, et al v. The Office of the Coptroller of The Currency, et al*, 21-civ- 00057, S.D.N.Y, the complaint recognizes:

> 4. As long as usury laws have existed, unscrupulous lenders have sought to evade them. States have countered these evasions by looking at the substance of any transactions alleged to be usurious, not merely the form devised by the lender.
>
> …
>
> 14. The [] States have every right to prohibit exploitative interest rate, even if other states decline to place limits on interest rates…

*See* Ex. A, ¶¶4;14.

6. New Jersey enforces both civil and criminal usury laws. The civil usury rate is set at 6% interest per year, or 16 % interest per year where a written contract specifies the interest rate. N.J. Admin. Code §3:1-1.1(a); N.J. Stat. Ann. §31:1-1; Ex. A, ¶154.

7. New Jersey law sets the criminal usury rates at 30% interest per year for loans to individuals and 50% interest per year for loans to corporations. N.J. Stat. Ann. §2C:21-19; Ex. A, ¶154.

8. Plaintiffs simply seek the enforcement of well-established usury regulations to loans that were issued from New Jersey, by a New Jersey lender.

## PARTIES

6. Plaintiff Erik Hansen-Dreijen is an Alabama resident with an address at 9057 Dauphin Island Parkway, Theodore, Alabama.

7. Plaintiff Martha Harris Hansen-Dreijen is an Alabama resident with an address at 9057 Dauphin Island Parkway, Theodore, Alabama.

8. Plaintiff Hansen-Dreijer Marine Enterprise, Inc. is an Alabama corporation with its principal address located 9057 Dauphin Island Parkway, Theodore, Alabama.

9. Defendant World Business Lenders, LLC is a limited liability company organized under the laws of the State of New York, with its principal place of business located at 101 Hudson Street, 33rd Floor, Jersey City, New Jersey, 07302.

10. Defendant WBO SPL I, LLC is a wholly owned subsidiary of World Business Lenders, LLC.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds seventy-five thousand ($75,000.00) dollars and there is complete diversity between Plaintiffs and Defendants.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as World Business Lender, LLC is located and conducts business in the State of New Jersey within the District of this Court.

## FACTUAL ALLEGATIONS

13. Plaintiff incorporates the foregoing paragraphs by reference as though same were fully set forth at length herein.

14. Hansen-Dreijer Marine Enterprise ("HDME") was founded by Erik's father in 1950 in Alabama. HDME is a tugboat business serving both coastwise and deep-sea domestic and foreign routes. When operating, the business employed a primary crew of five men with a relief crew of five men, alternating working thirty-day 24-hour shifts.

15. Erik is the owner of the company. He attended navigation school and thereafter worked and eventually took over his father's business. He spent his life and career dedicated to this business, which is the main source of income for his family.

16. Although Erik has decades of experience in his trade, he does not hold an advanced degrees, nor is he a sophisticated businessman.

17. On January 13, 2019, Erik suffered a very serious personal injury, which forced him to temporarily shut down his business.

18. In absence of funds to maintain his family business, Erik sought out loan opportunities from banks in vain.

19. Finding no other choice, Erik reached out to a broker, Justin White of Go Empower Group.

20. Mr. White put Erik in contact with World Business Lenders.

21. World Business Lenders offered Erik two loans, one in the amount of $60,000 and another one in the amount of $48,000.

22. After Erik decided to move forward with the loans, World Business Lenders slowly started to inform him of the different requirements to be fulfilled in order to obtain the loan, among which was putting his family home and additional property up as collateral for the loans.

23. World Business Lenders had not disclosed those terms initially, and when it did, Erik felt compelled to sign the agreement seeing no other choice.

24. World Business Lenders requested an appraisal of the home for which Erik had to pay out of pocket.

25. The home was appraised to be worth around $650,000.

26. Notwithstanding the fact that Plaintiff had to pay for the appraisal, World Business Lender never provided a copy of the documents.

27. Again, without having any other options at that point, and in an attempt to keep his family business and main source of income for his family afloat, Erik complied with the numerous requirements imposed by World Business Lenders, which increased as days went by.

28. On the morning of March 29, 2019, Erik received an email containing copies of the unsigned mortgages for both loans. Within a short hour, a notary showed up at his door and requested that Erik sign the loan documents. *See* Ex. B.

29. Erik had no time to review the documents provided by World Business Lenders prior to signing.

30. Erik was also not allotted sufficient time to have an attorney review the documents received from World Business Lenders.

31. Erik, like many other merchants who enter into this type of Business Loan Agreement, did not fully comprehend the details, risks, and implications of the transaction,

including the unconscionable annual interest, APR, broker commission, penalties and personal guarantee, and, as here, the risks associated with placing a mortgage on their home.

32. Erik signed the loans thinking he would be able to pay them back quickly because he planned on using the funds received to advance costs for a new job HDME was lined up to take, which would in turn have brought in the necessary income.

33. Erik was under the impression that he would be receiving the full amount of the loans when he agreed to enter into the transactions. That was not the case. Even though the loans were supposedly for principal amounts of $60,000 and $48,000, respectively, the actual amount received was for $58,847.54 for the first, and $43,862.30.

34. Erik was also told that he would not be responsible for any brokerage fees, but instead was charged a fee in the amount of $4,400.

35. Unfortunately, the actual amount received from the loans was insufficient to cover the up-front costs to allow HDME to take the job it was hoping to get back on track.

36. After attempting his best to comply with the large payments required under each loan, HDME no longer had sufficient funds.

37. On May 31, 2019, Erik received a letter from World Business Lenders informing him that they would be starting foreclosure proceedings on his family home. *See* Ex. C.

38. Erik continued his injury's recovery process throughout 2019, while also attempting to keep his business running by "cold sacking" their tugboat, the Kristen Grace over the course of his recovery process.

39. By the end of 2019 Erik achieved maximum medical improvement. However, just as things began looking up for his business, the pandemic caused his business to have to shut down.

    a. **The March 29, 2019 Loan with Mortgage on the Hansen-Dreijen's home**

40. On its face, this loan provided for a principal amount of $60,000.[1]

41. The actual amount of the loan was $57,847.54.

42. The loan has a purported Annual Interest Rate of 85.15%.

43. As a requirement under the Business Promissory Note, Erik executed a Mortgage, Assignment of Leases and Rents and Security Agreement on his home located at 9057 Dauphin Island Parkway, Theodore, AL 36582 (Lot 1). *See* Ex. E.

44. The loan provided for weekly repayments of $1,504 for 25 weeks.

45. Based on the terms of the loan, its simple interest of this loan greatly exceeded 50%.

46. Plaintiffs were only able to make four payments towards this loan (April 5, 12, 19, 26).

   b. **The March 29, 2019 Loan with Mortgage on the Hansen-Dreijen's property**

47. On its face, this loan provided for a principal amount of $48,000. *See* Ex. F.

48. The actual amount of the loan was $43,862.30 because WBL deducted closure fees and costs from the principal amount of the loan in addition to retaining one weekly payment in the amount of $2,510.80, prior to even paying the loan out to the merchant. Costs retained included a $795 processing fee payable to the lender, $590 "credit fee."

49. The loan terms prominently and deceivingly disclosed an interest rate of 0.34, a daily rate, which an unsophisticated borrower would not have understood, not to be equivalent to a monthly or annual rate.

50. Instead, the loan has an annual interest rate of 132.40%.

---

[1] Plaintiffs are not currently in possession of the note associated with this loan, however, some of the terms of the loan were made available by WBL in a proof of claim document filed in Alabama Bankruptcy proceedings on October 29, 2019, an action that was voluntarily filed by Plaintiffs. *See* Ex. D. Upon information and belief, the conditions and terms of the note are the same or substantially similar to those of the $48,000 loan which was entered into by Plaintiffs on the same date.

26302778v.1

51. As a requirement under the Business Promissory Note, Erik executed a Mortgage, Assignment of Leases and Rents and Security Agreement on his home located at 9057 Dauphin Island Parkway, Theodore, AL 36582 (Lot 2). *See* Ex. G.

52. The loan provided for weekly repayments of $2,510.80 for 25 weeks.

53. Based on the terms of the loan, its simple interest greatly exceeded 50%.

54. Plaintiffs were only able to make three payments towards this loan (April 5, 12, 19).

    c. **World Business Lender's scheme setting up Small Businesses for failure**

55. On information and belief, World Business Lenders was founded in 2011.

56. In May 2017, World Business Lenders' sales manager David Rabouin stated, regarding World Business Lenders, "We're an asset based lender." and "All of our loans are secured with real estate."

57. Below is a screen capture of a portion of the World Business Lenders Website discussing loan options[2]:



---
[2] The images below were retrieved from the WBL website in 2019.

58. The World Business Lenders website advertises, markets, offers and sells, short term (between 6 months and 36 months), high-cost financing to small business and their owners who need quick access to funds but who many not qualify for traditional financing, e.g. bank loans.

59. The loans require weekly or daily payments.

60. Weekly payments were a feature of Loans at issue in this case.

61. The World Business Lenders website advertises the use of personal assets as business collateral.

62. The use of personal assets as business collateral is a feature of the Loans at issue in this case.

63. On information and belief, World Business Lenders specializes in the product at issue in this case—business loans backed by a personal guaranty and a mortgage on real estate.

64. In May 2018, World Business Lenders announced a $30MM multi-draw credit facility from a Cayman Islands fund established by a consortium of Asian banks and investors.

65. In connection with that announcement, Robert Pardes, Chief Operating Officer of World Business Lenders stated that "this reaffirms increasingly broad institutional acceptance of our proprietary product and market leading servicing platform."

66. In connection with the same announcement, Matthew Yoon (Managing Director and Head of Asia at Pi Capital International LLC, which advised World Business Lenders with respect to the $30MM facility) said, "This transaction demonstrates desirability, even with cross-border investors of WBL's well-structured proprietary business loan product. WBL's veteran management and underwriting team has created an exciting new secured asset class for investors."

67. On information and belief, the Loan is an example of the "proprietary product" Pardes and Yoon were describing.

68. The reason for this specific practice is their knowledge that, due to their unfair and deceptive terms, the loans are designed to fail, resulting in a profitable foreclosure on valuable properties.

69. As evidence of the scheme perpetrated, World Business Lenders averages more than a 100 foreclosure actions per year and has a current property management portfolio of at least 50 properties that it has taken from its victims.

70. World Business Lenders business includes making loans in excess of the usury rate in New Jersey, which is 30% for personal loans and 50% for business loans.

71. World Business Lenders specifically targets small businesses in need of quick funds and pressures them into entering the unconscionable agreements by revealing the unconscionable terms of the agreements in piecemeal, once time is running out, leaving merchants with no choice but comply with all their requests. *See* Ex. H.

72. These same unconscionable practices are at issue in this case.

73. A recent article titled *Axos Bank: World Business Lenders Targets Merchants Hurt by Pandemic; Extends High Interest Predatory Loans Backed by Small Business Owners' Homes; States Assume Regulatory Role over Rent-A-Bank Schemes After FDIC, OCC Decline, by The Capital Forum*, published on September 4, 2020, described some of the illegitimate practices used by World Business Lenders to perpetrate their scheme, including "targeting desperate small businesses struggling from economic fallout" *See* Ex. I.

74. Some merchants who entered into transactions with World Business Lenders stated that "they were rushed to sign documents that they had not adequately reviewed because [World Business Lenders] said the loan offer would soon expire." *Id.* In some cases, as also in this case, World Business Lenders sent a notary to execute the documents within hours of emailing the loan

packet, giving borrowers inadequate time to review them. Some merchants stated that "when they signed the loan documents, they did not fully comprehend the details, risk and implications of the transaction, including the APR, broker commission, prepayment penalty, personal guarantee and the placing of the mortgage on their home." *Id.*

75. World Business Lenders overlooks the ability of these merchants to meet the strenuous terms of their loans, instead focusing on the valuation of the collateral.

76. In a similar action brought against World Business Lenders, *Kaur, et al. v. World Business Lenders, LLC, et al*, U.S. D. Mass., Civil Action No. 19-11364, involving comparable loan terms and similarly unsophisticated borrowers, expert Gary Klein, stated:

> 70. At the time the Loan was made, [World Business Lenders] could not have reasonably believed that the Plaintiffs' could repay the loan from their income…
>
> ***
>
> 73. The proposed loan payment schedule was unrealistic to the point that it appears to have been a fiction designed to hide that the Loan was effectively a form of real estate speculation in which the Plaintiffs' home was at stake.
>
> ***
>
> 77. The Loan was written at a shockingly high interest rate despite the extent of collateral protecting the Defendants' investment. Unless the goal of loan is to facilitate default, better collateral should lead to better interest rate…

*See* Ex. J.

77. WBL operates out of New Jersey.

78. On December 8, 2020, by the New Jersey Attorney General Office, in the Superior Court of New Jersey, Hudson County, in the action captioned Grewal, Attorney General of the State of New Jersey, et al. v. Yellowstone Capital, LLC, against a lender that issued loans similar

-11-

26302778v.1

in terms to those in this matter. *See* Ex. K. This complaint supports the application of New Jersey usury laws where loans were issued from the state of New Jersey. *Id.*

79. As victims of World Business Lenders' practices, Plaintiff's seek damages for violations of the New Jersey usury law.

### Count I: Injunctive Relief

80. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

81. Plaintiffs seek a permanent injunction precluding Defendants World Business Lenders and WBO SPL I, LLC from foreclosing on the property at 9057 Dauphin Island Parkway Theodore, AL.

### Count II: Usury (Civil)

82. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

83. World Business Lenders is the lender in the March 29, 2019 Transactions.

84. World Business Lenders operates and at all times relevant operated out the state of New Jersey.

85. World Business Lenders is subject to N.J.S.A. §31:1-1, which caps the legal interest rate on loans at 6% per annum, or 16% per annum when there is a written contract specifying the rate of interest.

86. The March 29, 2019 Loan Transactions both exceed the maximum legal interest rate allowed in this state, with an annual interest rate 85.12% and 132.40%, respectively, which is acknowledged in the terms of the loans.

87. World Business Lenders is liable for usury.

88. The Business Loan Agreements are illegal and unenforceable as a matter of law.

### Count III: Usury (Criminal)

89. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

90. World Business Lenders is the lender in the March 29, 2019 Transactions.

91. World Business Lenders operates and at all times relevant operated out the state of New Jersey.

92. World Business Lenders is subject to N.J. Rev. Stat. §2C:21-19, which caps the legal interest rate in New Jersey at 30% for non-corporate borrowers, and 50% for corporate borrowers.

93. The March 29, 2019 Loan Transactions both exceed the maximum legal interest rate allowed in this state, with an annual interest rate 85.12% and 132.4%, respectively, which is acknowledged in the terms of the loan.

94. World Business Lenders is liable for usury.

95. A violation of N.J. Rev. Stat. § 2C:21-19 is a felony punishable up to three years in prison.

96. The Business Loan Agreements are illegal and unenforceable as a matter of law.

### Count IV: Unconscionability (Terms)

97. Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

98. The Business Loan Agreements entered into with the World Business Lenders are unconscionable contracts of adhesion that are not negotiated at arms-length nor in good faith.

99.     Instead, they contain unconscionable, wholly unfair and one-sided terms that prey upon the desperation of the small business and their owners.

100.    For example, the Agreements required Plaintiffs to sign a guarantee and mortgage real estate assignment of their home and additional land, fully knowing that the loans were set up for failure and intending on profiting from foreclosing on Plaintiffs' property.

101.    The Business Loan Agreements are unconscionable and unenforceable as a matter of law.

### Count V: Unconscionability (Practices)

102.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

103.    World Business Lenders' practices are also unconscionable.

104.    Among other things, World Business Lenders did not reveal the full terms of the Loan Agreements until after Plaintiffs decided to move forward and did not allow sufficient time for Plaintiffs to review the terms of the Agreements or engage an attorney to review the same.

105.    The Business Loan Agreements are also unconscionable because they are designed to fail by providing for high weekly payments and interest rates in violation of usury laws.

106.    The Business Loan Agreements are unconscionable and unenforceable as a matter of law.

### Count VI: Violations of New Jersey Consumer Fraud Act
### N.J.S.A. 56:8-1 et seq.

107.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs as if fully set forth herein.

108.    The New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-2 prohibits:

> The act, use or employment by any person of any unconscionable commercial practice deception, fraud, false pretense, false promise, misrepresentation, or the knowing[]concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been myself, deceived or damage thereby…

109. The CFA defines "merchandise" as follows: "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S. A. 56:8-1(c).

110. World Business Lenders has engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-1(c), including the Business Loan Agreements at issue in this case.

111. In the operation of their business, Defendants engaged in the use of unconscionable commercial practices, misrepresentations and/or the knowing concealment, suppression or omission of material facts.

112. These unconscionable commercial practices include, but are not limited to the charging unlawful interest rates on Plaintiffs' loans and not revealing the full terms of the Loan Agreements until after Plaintiffs decided to move forward with the loans.

113. Each unconscionable commercial practice by Defendants constitutes a separate violation under the CFA.

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and seek an order from the Court:

a) Granting an injunction against Defendants restraining them from enforcing any of their rights under the March 29, 2019 Transactions, including the Loan, the Guaranty, and the Mortgages;

26302778v.1

b) Issuing a declaratory judgment that the Business Loan Agreements are illegal and unenforceable as a matter of law;

c) Enjoining Defendants from engaging in further practices in violation of New Jersey Usury Laws;

d) Directing Defendants to repay Plaintiffs all principal and interest and related fees previously paid by Plaintiffs to Defendants in connection with the criminally usurious loan, including prejudgment interest;

e) Directing Defendants to pay the maximum statutory civil penalties for each violation of the New Jersey Consumer Fraud Act, in accordance with N.J.S.A. §56:8-13;

f) Enjoining Defendants from further engaging in acts or practices in violation of the New Jersey Consumer Fraud Act;

g) Awarding Plaintiffs, their direct and consequential damages, including prejudgment interest, in an amount to be determined at trial;

h) Awarding punitive damages;

i) Awarding Plaintiffs attorneys' fees and costs incurred in this action;

j) Granting such other and further relief as this Court deems just and proper.

Dated: January 8, 2021                          Respectfully submitted,

                                                WHITE AND WILLIAMS, LLP

                                                _____
                                                Laura Rossi (ID# 200782016)
                                                457 Haddonfield Rd # 400
                                                Cherry Hill, NJ 08002
                                                Tel. (215) 864-6366
                                                rossil@whiteandwilliams.com